FOUNDATION SECURITIES CORPORATION et al *v.* Hardy A. PITTARD

5-5026                                                            447 S. W. 2d 324

Opinion delivered November 17, 1969

[Rehearing denied December 22, 1969]

*Howell & Price,* for appellants.

*Cooper Jacoway,* for appellee.

GEORGE ROSE SMITH, Justice. This action was brought by the appellee Pittard to recover a $15,000 real estate agent's commission for having sold a tract of land in Little Rock for the appellants, Foundation Securities Corporation and a companion company. The defendants denied liability on the ground that Pittard's right to a commission was contingent upon the actual closing of the sale—an event which admittedly never took place. The trial court granted the plaintiff's motion for summary judgment upon the pleadings and affidavits on file. For reversal the appellants contend that there are questions of fact about whether the sale could have been closed without the consent of the Little Rock Housing Authority.

The facts, as might be expected in view of the summary judgment, are for the most part undisputed. Foundation Securities orally employed Pittard to find a purchaser for the land. Pittard succeeded in interesting Gus B. Walton in the property at the stipulated price of $265,000. On March 23, 1965, two contracts were signed. First, Walton paid Foundation Securities $5,000 for a written option to purchase the land. Second, Foundation Securities signed and delivered to Pittard the two-sentence contract now sued upon:

In consideration of services rendered by Harry A. Pittard in the sale of [the land] the undersigned agrees to pay Mr. Pittard a commission of Fifteen Thousand Dollars ($15,000.00). This commission to be payable upon closing of the sale to Gus B. Walton.

Both sides agree that the insertion of the specific requirement that the sale be closed takes the case out of the usual rule that a real estate agent earns his commission merely by producing a person ready, willing, and able to buy the property. Pittard insists, however, that the sellers arbitrarily refused to close the sale and accept Walton's money, thereby waiving the condition in Pittard's contract. *Pinkerton* v. *Hudson*, 87 Ark. 506, 113 S. W. 35 (1908).

There is, however, another condition to be considered, which brings us to the crux of the case. According to the record, the sale from Foundation Securities to Walton may have been contingent upon the approval of the Housing Authority, from which Foundation Securities had acquired the property. Two documents in the record indicate the necessity for the Housing Authority's consent: One, Walton's option recited that the sellers would obtain from the Housing Authority such permissions, consents, and approvals as might be required to *enable* the sellers to consummate the transaction. Two, the counter-affidavit of Lyle Bettis, an officer of Foundation Securities, states that Pittard's commission was upon condition that the sale to Walton be *closed,* and goes on to explain: "The reason for the condition . . . being that the property could not be sold without the approval of the Little Rock Housing Authority and could not be sold for a profit."

At the oral argument Pittard's attorney insisted that the quoted language in the Bettis affidavit should be disregarded, because it states merely a reason rather than a fact. A fact, however, may be stated in the form

of a reason, as when we say: "The cause of action abated upon the plaintiff's death, the reason being that the plaintiff had only a life estate in the land." Moreover, on motion for summary judgment the testimony must be viewed in the light most favorable to the side resisting the motion; so any uncertainty must be resolved in favor of the appellants. *Van Dalsen* v. *Inman,* 238 Ark. 237, 379 S. W. 2d 261 (1964).

We conclude, therefore, that there is a question of fact whether the Housing Authority's approval was essential to the consummation of the sale. Even so, Pittard insists that the appellants cannot shield themselves behind the Housing Authority's nonconsent to the sale, because, Pittard argues, that obstacle was eliminated in a suit brought by Walton for specific performance of his option to buy.

This particular point is pivotal. The record shows that Walton filed suit against the sellers for specific performance of the contract. The Housing Authority was not a party to the case. The sellers' answer interposed several defenses, one being that the Housing Authority had not approved Walton's option to purchase and had advised the parties that it would not approve any transfer or conveyance of the property prior to the completion of certain improvements that had not then been made.

The evidence in the earlier case was not brought into the present record. The decree made no findings of fact whatever, merely reciting that Walton was entitled to a decree directing the sellers to specifically perform their contract. The sellers gave notice of appeal, but Walton died before the appeal was perfected. According to the Bettis affidavit, after Walton's death "the heirs were unwilling to complete the sale, the Housing Authority never gave permission for the sale at the purchase price of $265,000.00, and the sale was never completed to Gus Walton or his heirs." Apparently the

heirs and the sellers abandoned both the suit and the sale.

Upon this point Pittard argues that when Walton sued for specific performance "he irrevocably elected to pursue that remedy and irrevocably abandoned his option (in the contract) to call the contract at an end and to secure his money back. *Bigger* v. *Glass,* 226 Ark. 466, 209 S. W. 2d 641 (1956); *Belding* v. *Whittington,* 154 Ark. 561, 243 S. W. 808, 26 A. L. R. 107 (1922). So, when Gus Walton filed suit for specific performance, he gave up his right to call the contract at an end. Since he did not have that right, his heirs, who stood in his place, possessed no greater rights than he did."

The appellee, we think, misconstrues the scope of the doctrine of election of remedies, discussed in the two cases cited. True, when a plaintiff sues for specific performance he cannot, over the defendant's objection, dismiss that case and bring suit for damages instead. It does not follow, however, as the appellee argues, that the mere filing of the first suit irrevocably commits the plaintiff to purchasing the property—so much so that he cannot change his mind and drop the whole transaction.

To the contrary, it is plain enough that, just as in any contested lawsuit, the plaintiff is always at liberty to abandon the pursuit of his cause of action. In fact, that point was clearly recognized in the *Belding* case, where we said that an election, once made, cannot be withdrawn "without due consent." Hence, with the defendant's consent, the plaintiff can change from one remedy to the other. It is even plainer that he can withdraw from the litigation altogether if he chooses to do so, with or without his adversary's consent.

As we have seen, the Housing Authority's approval of the sale may have been required. Upon that point, to say the least, a question of fact is involved. The plain-

tiff, in asking for a summary judgment in the court below, had the burden of eliminating that question of fact from the case. "A motion for a summary judgment is an extreme remedy and the burden of demonstrating the nonexistence of a genuine fact issue is upon the party moving for the summary judgment." *Deltic Farm & Timber Co.* v. *Manning,* 239 Ark. 264, 389 S. W. 2d 435 (1965).

Here the appellee has not met that burden. Even after the entry of the decree in the earlier case Walton might have become convinced that the chancellor's decision had been wrong and would be reversed on appeal. In that situation he would certainly have been at liberty to drop the suit and surrender whatever rights he had under the option contract. Upon Walton's death his heirs stepped into his place and may have acted in the manner we have suggested. Furthermore, the Housing Authority was not a party to that case; so if its consent to the sale was actually required, a contrary finding by the court would not have been binding upon the Authority. Upon the record as a whole we are convinced that the earlier decree, which was abandoned by the parties, does not satisfy Pittard's burden of showing that the necessity for the Authority's consent to the sale has been eliminated from the case.

Reversed and remanded for further proceedings.

HARRIS, C. J., and HOLT, J., dissent.

CARLETON HARRIS, Chief Justice, dissenting. I do not agree that a question of fact is presented in this litigation. The option agreement is composed of 13 sections, and to my mind, a reading of this instrument makes clear that its provisions are almost entirely for the benefit of the optionee (Walton), and the only portion that is pointed out by appellant as supporting its argument (that there is a fact question) is found in Section 9, which provides that appellant agrees that it will, at its own expense, undertake to:

"(a) Obtain from the Housing Authority of the City of Little Rock such permissions, consents and approvals, in written form satisfactory to optionee, as might be required to *enable*[1] Optionors to consummate this transaction and to assign and convey to Optionee. Said instruments shall assure, to Optionee's satisfaction, that the lands conveyed may be used by him for the construction and operation of a motel, motor inn, motor hotel or other similar facility and such other businesses as are usually conducted in connection with such facilities."

Appellant asserts that the italicized word means that it had to obtain permission from the Housing Authority before the transaction could be consummated; however, Subsection (c) provides that, if appellant fails to obtain permissions, approvals, and consents, optionee shall have the right, at *his* option, to take such steps as he may deem necessary to obtain same, and Section 10 sets out that, if the company is unable to obtain all consents, approvals, permissions, etc., and is unable to convey title in accordance with the terms of the contract, "then optionee shall have the right to terminate this contract of sale upon written notice of optionors * * *." In other words, it is up to Walton as to whether he still desires to purchase the property, even though the company is unable to secure the Housing Authority authorization.

Perhaps, if the option agreement and the affidavit of Bettis were the only evidence offered, it could be said that the provision emphasized by appellant as creating a fact question ("as might be required to enable optionors to consummate this transaction"), is ambiguous, but a subsequent event, in my opinion, resolved this question. This event was the filing of a complaint by Walton on February 8, 1966, against appellant and Christian Foundation Life Insurance Company, where-

---

[1] My emphasis.

in Walton, relying on his option agreement of March 23, sought specific performance against the defendants asserting, *inter alia*:

"Plaintiff has at all times been ready, willing and able to comply with his obligations under the contract between the parties; has expressed his readiness, willingness and ability to the defendants; and has demanded that they comply with said contract and execute and deliver to him a conveyance of the property described above in accordance with the contract. Despite such demands, Defendants have failed and refused to comply with said contract and have breached same by refusing and continuing to refuse to convey said property to Plaintiff."

Appellant answered, and for its defense, first alleged that Walton had not complied with the provisions of the option in that he had not exercised same within the time period allowed by that instrument. It was further asserted, *inter alia,* that the property was inadequate for the construction of Walton's proposed improvements, and he had advised that he would not proceed unless the defendants agreed to sell him an additional tract of land not included in the option agreement. It was then asserted that the companies had written Walton, returning his $5,000.00; that new plans had been made by them, and that they had purchased for their own use a national motel franchise, and had incurred numerous expenses in connection with their own plans to build a motel. Numerous other defenses, however, not pertinent to the question at hand were pleaded, and finally in Section 9, in the next to last defense, appellant stated that the Little Rock Housing Authority would not approve any conveyance of the property prior to completion of required improvements, and it was impossible to convey title to Walton as contemplated in the option.

Thus, it is observed that the very defense raised in

the case presently before us was presented in that litigation, but the court's decree found that Walton was entitled to a decree, and it directed appellant (and Christian Foundation) to specifically perform the contract and deed the property to Walton upon the payment of the $260,000.00, and the redelivery of the $5,000.00. According to one of the affidavits, an appeal was taken by appellant, but never perfected, Walton dying some five months after the entry of such decree. Pittard's affidavit sets out:

"I am informed and believe that Christian Foundation Life and Foundation Securities entered into an agreement with the heirs of Gus B. Walton, by which Foundation Securities and Christian Foundation Life surrendered their right to collect the purchase money, in the amount of $265,000.00."

Bettis' affidavit states:

"Gus Walton died and the heirs were unwilling to complete the sale, and the housing authority never gave permission for the sale at the purchase price of $265,-000.00. The sale was never completed to Gus Walton or his heirs. The condition precedent in the commission contract was never met."

Appellee's agreement with appellant concluded, as follows:

"This commission to be payable upon closing of the sale to Gus B. Walton."

I think that as far as Pittard's rights are concerned, the sale was closed. The court, in rendering the decree for Walton, necessarily found that he had exercised his option in time, and was willing and able to carry out his part of the agreement, and that the agreement to convey was not conditioned upon approval by the Housing Authority. It is thus apparent that the deal would

have been actually closed, except for appellant's action in refusing to convey. The language in *Pinkerton* v. *Hudson*, 87 Ark. 506, 113 S. W. 35, is particularly *apropos* in this case. There we said:

"* * * And when appellee, by dismissing his suit in chancery to enforce the contract, virtually refused to collect the purchase money, he immediately became liable to appellant for his commission."

Any agreement between Foundation Securities Corporation and Walton's heirs could not deprive Pittard of his commission, for the commission was certainly earned no later than when the court entered its decree finding that appellant would not convey. Whatever disposition was made of the appeal is immaterial, since it is established that the appeal was not perfected, thus leaving the Chancery Court's decree in full force.[2] That decree in effect, found that the only reason the agreement between appellant and Walton had not been closed was because the company refused to do so. Under his agreement, Pittard is entitled to his commission.

I respectfully dissent.

HOLT, J., joins in this dissent.

---

[2]The only fact in connection with the Chancery Decree that could have had any effect would be that the decree was set aside, either at the instance of Walton, or by the court, and if this were done, appellant should have—and undoubtedly would have—included such fact in its affidavit.